**Edward L. SHUFFORD, Plaintiff,**

v.

**TRUCK DRIVERS, HELPERS, TAXICAB DRIVERS, GARAGE EMPLOYEES AND AIRPORT EMPLOYEES LOCAL UNION NO. 355, et al., Defendants.**

**Emmanuel GRANT, Plaintiff,**

v.

**TRUCK DRIVERS, HELPERS, TAXICAB DRIVERS, GARAGE EMPLOYEES AND AIRPORT EMPLOYEES LOCAL UNION NO. 355, et al., Defendants.**

Civil Nos. H–95–1262, H–95–1288.

United States District Court,
D. Maryland.

July 9, 1996.

Alexander R. Martick, Baltimore, MD and Lawrence E. Schmidt, Potthast and Schmidt, Towson, MD, for Plaintiffs.

H. Victoria Hedian, James R. Rosenberg, Abato, Rubenstein & Abato, Towson, MD, for Defendants.

## MEMORANDUM OPINION

ALEXANDER HARVEY, II, Senior District Judge.

Plaintiffs Edward L. Shufford and Emmanuel Grant are former employees of The Baltimore Sun Company ("the *Sun*"). During their employment with the *Sun*, plaintiffs were members of defendant Truck Drivers, Helpers, Taxicab Drivers, Garage Employees and Airport Employees Local Union No. 355 ("the Union"). Defendants Michael Culver, Harry Crout, and William Dye were officials

of the Union during the time periods relevant to this civil action.[1]

In early 1992, plaintiffs were dismissed from their jobs with the *Sun* because of their alleged involvement in the theft of newspapers and their alleged misuse of company property. Criminal charges related to the alleged thefts had been brought in Baltimore City courts against plaintiffs before their discharge. Pursuant to the Collective Bargaining Agreement ("CBA") between the Union and the *Sun*, each plaintiff promptly filed a grievance protesting the termination of his employment. After the *Sun* initially denied these grievances, the Union waited for over a year, until the criminal charges pending against the plaintiffs had been resolved, before taking further steps in the grievance procedures set forth in the CBA. In so delaying, Union officials believed that the *Sun* had agreed to hold plaintiffs' grievances in abeyance until the criminal matters had been resolved and to meanwhile waive the applicable time requirements set forth in the CBA for further pursuing their grievances.

The criminal charges against plaintiffs eventually were dismissed, and the Union then sought to go forward with the pending grievances. The *Sun*, however, denied the existence of any agreement between the parties to hold the grievances in abeyance or to waive the time limits contained in the CBA. The matter then went to arbitration, and, following a hearing, an arbitrator ultimately determined that there had never existed an agreement to hold the grievances in abeyance. Plaintiffs' grievances were accordingly denied as untimely.

Plaintiff Shufford then filed this civil action in this Court, naming as defendants the Union, Culver, Crout, and Dye. His amended complaint alleges that the defendants violated their duty of fair representation under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, by, *inter alia*, failing to pursue his grievance in a timely fashion. As relief, plaintiff Shufford seeks substantial compensatory and punitive damages. Plaintiff Grant soon thereafter filed a nearly identical complaint, and the two cases were subsequently consolidated for all purposes, pursuant to Rule 42(a), F.R.Civ.P.

Discovery is now complete, and all defendants have moved for summary judgment. The parties have submitted memoranda, exhibits, deposition excerpts and affidavits both in support of and in opposition to the pending motion. The parties have also provided the Court with a transcript of the arbitration hearing and the memoranda submitted in conjunction with that hearing. A hearing on the pending motion has now been held in open Court. For the reasons to be stated herein, the Court will grant defendants' motion for summary judgment and will enter judgment in both cases in favor of the defendants.

## I

### *Facts* [2]

Until early 1992, plaintiff Shufford was employed by the *Sun* as a garage attendant, and plaintiff Grant was employed by the *Sun* as a truck driver. Both Shufford and Grant were members of the Union. In addition to working for the *Sun*, both plaintiffs were also "hawkers" of newspapers at different locations and sold, themselves or through agents, Sunday editions of the *Sun* from assigned street corners in Baltimore. Plaintiff Grant operated two hawkers stands, and plaintiff Shufford operated one such stand. In conducting their hawkers businesses, plaintiffs acted as independent contractors.

In the summer of 1991, the *Sun* hired the private investigative firm of Dennis E. Seymour & Associates ("Seymour") to conduct an investigation into the theft of its newspapers by hawkers. Seymour in time focused its attention on plaintiffs and uncovered evi-

---

1. Culver was the Union shop steward at the *Sun*. Crout was the Union business representative assigned to the *Sun*. He was eventually replaced by Dye.

2. Because plaintiffs are the non-movants here, the facts summarized below, where disputed, reflect plaintiffs' version of the events to the extent it is supported by affidavits, depositions or other documentary evidence. *Magnuson v. Peak Technical Servs., Inc.*, 808 F.Supp. 500, 504 (E.D.Va. 1992).

dence believed by it to establish that plaintiffs were engaged in criminal activity. On December 19, 1991, both plaintiffs were indicted by a Baltimore City grand jury and were charged with grand theft for engaging in "a continuing scheme and course of conduct" involving the theft of *Sun* newspapers occurring from September 15, 1991 to November 30, 1991.

On January 21, 1992, plaintiff Shufford was summoned to a meeting with four *Sun* management personnel, namely, Howard Weinstein (the Director of Labor Relations), Gerald Zakes (the Manager of Fleet and Distribution Operations), Bruce McEntee (the Director of Distribution) and John Vadas (the Safety and Fleet Administrative Manager).[3] Defendant Culver, the shop steward for the Union, attended the meeting as well. At this meeting, management personnel questioned Shufford concerning his operation of his hawkers stand and his use of company vehicles in connection with this business. Acting on the advice of his attorney[4], Shufford refused, because of the pending criminal charges, to respond to questions posed by *Sun* personnel. He requested that he be allowed to answer "off the record," but this request was denied. At the conclusion of the meeting, *Sun* management decided to terminate Shufford's employment because he had failed to rebut the allegations of misconduct lodged against him. By letter dated January 22, 1992, Weinstein advised Shufford in writing that he was being discharged because he had been observed misusing a company vehicle, because he had inaccurately reported his hawker newspaper sales, because he had been directly implicated in the theft of *Sun* newspapers and because he had not offered any rebuttal to the *Sun*'s allegations of misconduct.

Also on January 22, 1992, plaintiff Grant met with the same management personnel and with Culver. Grant also was questioned concerning his alleged unauthorized use of company vehicles and the alleged theft by him of newspapers. He answered some, but not all, of the questions posed by the management personnel. After this meeting, Grant was suspended while the *Sun* investigated his responses to the allegations of misconduct. After a follow-up meeting on February 6, 1992, Grant was also fired. By letter dated February 7, 1992, Weinstein advised Grant that he had been terminated because of his involvement in the theft of newspapers, in the misuse of a company vehicle, and in unauthorized route departures and because the *Sun*'s investigation of the explanation offered by him to the charges failed to absolve him of culpability.

Pursuant to the CBA, plaintiffs were entitled to file grievances to protest their dismissals. The CBA established a four-step grievance procedure. The first step consisted of an oral discussion of the grievance by the employee's supervisor, the employee and/or the shop steward. The second step of the procedure required the employee to reduce his grievance to writing, whereupon the Union shop steward was required to sign the grievance and present it to the *Sun*'s Transportation Fleet Manager. The parties agree that in this case the first and second steps were properly and timely followed by the Union. The meetings on January 21 and 22, 1992 and on February 6, 1992 constituted the first step, after which both plaintiffs had timely filed written grievances which were presented to Zakes, the Fleet Manager. On February 10, 1992, Shufford's written grievance was denied by Zakes, and Grant's written grievance was denied by Zakes on February 20, 1992. In denying Shufford's grievance, Zakes stated that his discharge had been based on the findings of an internal investigation. In denying Grant's grievance, Zakes stated that evidence of his improprieties was consistent and unrebutted.

Under the third step of the grievance procedure, the Union representative (Crout) was required, within seven days of the denial of each written grievance, to present the written grievance to the *Sun*'s representative (Weinstein) and arrange a meeting in an

---

3. Vadas was present for the sole purpose of taking notes during the meeting.

4. Alexander Martick, Shufford's attorney in this case, also served as his counsel in the criminal case.

attempt to resolve the dispute. If the grievance was once again denied, the Union could, within ten days of such denial, file for arbitration. The CBA specifically provided that the time limits "may be extended by mutual consent in writing."

After the written grievances were denied by Zakes, the Union did not immediately pursue a meeting at the third step. As discussed in greater detail hereinbelow, defendants contend that, as soon as the grievance process began, the *Sun* and the Union entered into an oral agreement to waive the time requirements of the CBA and to hold the grievances in abeyance until after the resolution of the criminal charges. Plaintiffs deny that any such agreement existed.

In any event, the criminal cases against plaintiffs were consolidated and scheduled for trial in the Circuit Court for Baltimore City in April of 1992. The trial was postponed, however, and was rescheduled for June 15, 1992. On that date, when the two cases came on for trial before Judge David Ross, the Assistant State's Attorney moved to amend the indictment. Counsel for the defendants objected to the prosecutor's motion, and Judge Ross sustained their objection. Unwilling to proceed on the original indictment, the prosecution then entered a *nolle prosequi.*

After learning that the criminal charges had been dismissed in the Circuit Court for Baltimore City, defendant Culver spoke to Weinstein concerning plaintiffs, grievances. According to Culver, Weinstein noted "unofficially" that the charges were to be re-filed and stated that the parties should hold off until the criminal charges were resolved. Weinstein did not at the time mention anything about the grievances being untimely. However, plaintiffs contend that both in the spring of 1992 and in July of 1992, Crout had been told by *Sun* management that the grievances were "dead." Crout denies that any such statements were made to him.

The criminal charges against plaintiffs were re-filed in the District Court for Baltimore City on July 30, 1992.[5] Both Shufford

and Grant were charged with six counts of petty theft and one count of grand theft. Each petty theft charge carried a potential penalty of 18 months in prison and a $500 fine, while the grand theft charge carried a potential penalty of 15 years imprisonment and a $1000 fine. The consolidated case did not come on for trial until March 8, 1993. After three and one-half days of testimony, the Assistant State's Attorney once again entered a *nolle prosequi* on the criminal charges after the trial judge had indicated a willingness to grant motions for judgment of acquittal filed on behalf of Shufford and Grant.

Plaintiffs then informed Culver that the criminal charges had once again been dismissed. Culver contacted defendant Dye, who had replaced Crout as the Union business agent for the *Sun* in the spring of 1992.[6] Dye then spoke to Weinstein and told him that the charges against plaintiffs had been dismissed. Weinstein's initial response was to inquire as to the type of relief which plaintiffs were seeking from the *Sun* in their grievances. After Dye had informed him that plaintiffs wanted reinstatement, back pay and benefits, as well as $12,000 in attorneys' fees incurred in defending the criminal charges, Weinstein indicated for the first time that plaintiff's grievances might not be timely. Weinstein also for the first time denied that there was any oral agreement between the parties that the grievances be held in abeyance. The Union then filed for arbitration on April 5, 1993.

Initially, the *Sun* opposed sending the matter to arbitration because, in its view, the grievances were untimely and there was accordingly no issue which could be presented to the arbitrator. Eventually, it was agreed between the parties that the matter would proceed to arbitration, that the timeliness issue would be decided first by the arbitrator and that then, if necessary, a second arbitration hearing would be held relating to the merits of plaintiffs' grievances. Unfortunately, the lead attorney for the Union, Barry Frame, Esq. of the firm of West, Frame and

5. Dennis Seymour, the investigator, filed the formal Application for Statement of Charges.

6. Crout remained President of the Union.

Barnstein, died of lung cancer soon after this agreement to bifurcate the arbitration proceedings had been reached. Another attorney from the same law firm, Catherine Flynn, Esq., stepped in as lead counsel, and the arbitration hearing was scheduled for March 15, 1994. This hearing was postponed when it appeared that the parties might be able to settle the matter. These settlement efforts ultimately failed, and, in April of 1994, the Union dismissed its counsel and retained the firm of Abato, Rubenstein and Abato to represent it at the arbitration hearing.[7]

Plaintiffs' grievances then were consolidated, and an arbitration hearing was held on June 30, 1994 before Arbitrator James Harkless, Esq. David Sherbow, Esq., of the Abato firm represented the Union. The sole issues addressed at this hearing were whether or not plaintiffs' grievances had been pursued in a timely fashion and whether or not the *Sun* and the Union had orally agreed to waive the time limits contained in the CBA. Arbitrator Harkless heard testimony from management personnel of the *Sun*, from defendants Culver, Crout and Dye, and from plaintiff Grant. Plaintiff Shufford did not testify. On November 3, 1994, Harkless issued a 45–page opinion reviewing the evidence presented at the hearing and concluding that no agreement between the parties existed for holding the grievances in abeyance during the pendency of the criminal case. Accordingly, Harkless denied plaintiffs' grievances as being untimely.

Shufford and Grant then filed separate complaints in this Court pursuant to § 301 of the LMRA, 29 U.S.C. § 185, alleging that defendants had breached their duty of fair representation. The two cases were consolidated for all purposes by this Court's Order of November 2, 1995.

## II

### *Plaintiffs' Claims*

The complaints filed by plaintiffs are nearly identical.[8] Both plaintiffs allege that, in several ways, defendants breached the duty of fair representation imposed on the Union by federal labor law. Count I of each complaint alleges that defendants knew that the *Sun* had not agreed to waive the time limits in the CBA, but that defendants deliberately misled plaintiffs to believe that their grievances would be considered after the criminal charges were resolved. Plaintiffs allege that defendants' actions were arbitrary, discriminatory, and done in bad faith.

In Count II, it is alleged that the failure of defendants to meet the time requirements of the CBA denied to plaintiffs the right to have the merits of their grievances determined by an arbitrator. Count III alleges that defendants were "reckless, careless and negligent" because they were unprepared for the arbitration hearing, failed to call plaintiff Shufford as a witness, and refused to accept assistance from plaintiffs' private attorneys.

In each Count, the plaintiffs seek compensatory damages in the amount of $500,000. Each plaintiff also seeks punitive damages in the amount of $2,000,000 in Count I of their respective complaints. However, punitive damages are not available in a case alleging a breach of the duty of fair representation. In *International Brotherhood of Electrical Workers v. Foust*, 442 U.S. 42, 52, 99 S.Ct. 2121, 2127–28, 60 L.Ed.2d 698 (1979), the Supreme Court held that punitive damages could not be assessed against a union that breaches its duty of fair representation. Although the claim in *Foust* was brought under the Railway Labor Act, the Court relied upon the fact that "general labor policy disfavors punishment." *Id.* The Fourth Circuit has subsequently held that *Foust* "established a *per se* rule prohibiting punitive damages in all duty of fair representation actions." *Peterson v. Air Line Pilots Ass'n, Int'l*, 759 F.2d 1161, 1167 (4th Cir.), *cert. denied*, 474 U.S. 946, 106 S.Ct. 312, 88 L.Ed.2d 289 (1985); *see also Chambers v. McLean Trucking Co., Inc.*, 550 F.Supp.

---

**7.** The Abato firm represents all of the defendants in this case.

**8.** Plaintiff Shufford, a black male, alleged in Count IV of his amended complaint that the Union had discriminated against him because of his race. At oral argument, counsel for Shufford stated that Count IV was being withdrawn. Plaintiff Grant, also a black male, did not allege a claim of racial discrimination in his complaint.

1335, 1337 (M.D.N.C.1981) (punitive damage claim under 29 U.S.C. § 185 was "frivolous" in light of *Foust* ).

Discovery has been now completed, and defendants have moved for summary judgment as to all counts of both of plaintiffs' complaints.

## III

### Summary Judgment Principles

It is well established that a defendant moving for summary judgment bears the burden of showing the absence of any genuine issue of material fact and that it is entitled to judgment as a matter of law. *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir. 1984). Where, as here, the nonmoving party will bear the ultimate burden of persuasion at trial, "the burden on the moving party [at the summary judgment stage] may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). One of the purposes of Rule 56 of the Federal Rules of Civil Procedure is to require a plaintiff, in advance of trial and after a motion for summary judgment has been filed and properly supported, to come forward with some minimal facts to show that a defendant may be liable under the claims alleged. *See* Fed.R.Civ.P. 56(e). If the nonmoving party "fail[s] to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," then "the plain language of Rule 56(c) mandates the entry of summary judgment." *Catrett*, 477 U.S. at 323, 322, 106 S.Ct. at 2552.

While the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the party opposing the motion, *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985), "when the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct.

1348, 1356, 89 L.Ed.2d 538 (1986). " 'A mere scintilla of evidence is not enough to create a fact issue; there must be evidence on which a jury might rely.' " *Barwick*, 736 F.2d at 958–59 (quoting *Seago v. North Carolina Theatres, Inc.*, 42 F.R.D. 627, 640 (E.D.N.C. 1966), *aff'd*, 388 F.2d 987 (4th Cir.1967), *cert. denied*, 390 U.S. 959, 88 S.Ct. 1039, 19 L.Ed.2d 1153 (1968)). Moreover, only disputed issues of *material* fact, determined by reference to the applicable substantive law, will preclude the entry of summary judgment. "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

In the absence of the necessary minimal showing by the plaintiff that the defendant may be liable under the claims alleged, the defendant should not be required to undergo the considerable expense of preparing for and participating in a trial. *See Catrett*, 477 U.S. at 323–24, 106 S.Ct. at 2552–53; *Anderson*, 477 U.S. at 256–57, 106 S.Ct. at 2514–15. Indeed, the Fourth Circuit has stated that, with regard to motions for summary judgment, the district courts have "an affirmative obligation ... to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Catrett*, 477 U.S. at 323–24, 106 S.Ct. at 2552–53).

Applying these principles to the facts of record here, this Court has concluded that defendants' motion for summary judgment must be granted.

## IV

### Duty of Fair Representation

It is well established that a union, as the exclusive bargaining representative, has a statutory duty to represent all members of its bargaining unit fairly, both in collective bargaining and in the enforcement of the resulting collective bargaining agreement. *See, e.g., Humphrey v. Moore*, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964); *Ford Motor Co. v. Huffman*, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953). In order to estab-

lish that a union has breached its duty of fair representation, a member of the bargaining unit must prove that the union's conduct toward him or her was "arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967). The primary purpose of the law's imposition of this duty of fair representation is to ensure that bargaining unit members "not be deprived of all effective means of protecting their own interests." *Aguinaga v. United Food and Commercial Workers Int'l Union,* 993 F.2d 1463, 1471 (10th Cir. 1993), *cert. denied,* 510 U.S. 1072, 114 S.Ct. 880, 127 L.Ed.2d 75 (1994). However, an employee does not have an absolute right to have a grievance taken all the way through the arbitration process. *Vaca,* 386 U.S. at 191, 87 S.Ct. at 917.

■ A union's conduct will be considered "arbitrary" only if "in the light of the factual and legal landscape at the time of the union's actions, the union's behavior [was] so far outside a 'wide range of reasonableness,' as to be irrational." *Air Line Pilots Ass'n, Int'l v. O'Neill,* 499 U.S. 65, 67, 111 S.Ct. 1127, 1130, 113 L.Ed.2d 51 (1991) (quoting *Huffman,* 345 U.S. at 338, 73 S.Ct. at 686). To prove that a union's conduct was discriminatory, a plaintiff must establish that the union's actions were "invidious." *Id.* at 81, 111 S.Ct. at 1137. Moreover, "bad faith" may be established only by a showing of fraud, or deceitful or dishonest action. *International Union of Electronic Workers v. NLRB,* 41 F.3d 1532, 1537 (D.C.Cir.1994). From these authorities, it is manifest that a plaintiff alleging a breach of the duty of fair representation faces a heavy burden in seeking to establish that a union's actions were arbitrary, discriminatory, or conducted in bad faith.

The principal contention advanced by plaintiffs in this case is that the Union acted arbitrarily in its handling of their grievances. In order that a union may have appropriate latitude in its manner of operation, the test for determining whether particular conduct is arbitrary "can be quite forgiving." *Garcia v. Zenith Elec. Corp.,* 58 F.3d 1171, 1176 (7th Cir.1995). A union is entitled to act within a wide range of reasonableness, and a court should not substitute its own judgment for that of the union. *See, e.g., Considine v. Newspaper Agency Corp.,* 43 F.3d 1349, 1357 (10th Cir.1994).

■ Accordingly, liability for a breach of the duty of fair representation based on a union's arbitrary behavior will be imposed only if the union's actions were wholly unreasonable. In ruling on defendants' motion for summary judgment, this Court must determine whether plaintiffs have presented at this stage of the proceedings sufficient evidence to allow a reasonable jury to conclude that the union's actions were "so far outside a 'wide range of reasonableness' as to be irrational." *See O'Neill,* 499 U.S. at 67, 111 S.Ct. at 1130.

### V

### *Discussion*

#### (a)

#### *Claims Against the Individual Defendants*

■ Initially, the Court has concluded that the individual Union officials named as defendants in this case are entitled to summary judgment. A union official may not be held personally liable for damages for a breach of the duty of fair representation. *Complete Auto Transit, Inc. v. Reis,* 451 U.S. 401, 407, 101 S.Ct. 1836, 1840–41, 68 L.Ed.2d 248 (1981); *Atkinson v. Sinclair Refining Co.,* 370 U.S. 238, 247–49, 82 S.Ct. 1318, 1324–27, 8 L.Ed.2d 462 (1962).

Summary judgment will therefore be entered in favor of defendants Culver, Crout and Dye. However, a more extended discussion is necessary for proper consideration of the plaintiffs' claims against the Union.

#### (b)

#### *Failure to Timely Pursue Plaintiffs' Grievances*

■ Plaintiffs' principal claim is that the Union breached its duty of fair representation when it failed to pursue in a timely fashion steps three and four of the grievance procedure. In responding to this claim, the Union contends that Culver, Crout and Dye reasonably believed that there existed an oral agreement with the *Sun* to hold the

grievances in abeyance during the pendency of the criminal charges against the plaintiffs and meanwhile to waive the time requirements of the CBA. Although Arbitrator Harkless ultimately found that no such oral agreement existed, the Union asserts that its belief was not so unreasonable as to constitute a breach of its duty of fair representation. This Court must therefore determine whether a reasonable jury could conclude on the record here that it was irrational for the Union to believe that the *Sun* had agreed to waive the time requirements of the CBA.

The Supreme Court in *Vaca* stated that "a union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion...." *Vaca*, 386 U.S. at 191, 87 S.Ct. at 917. The Union has not in this case argued that plaintiffs' grievances were not meritorious. According to plaintiffs, the Union breached its duty of fair representation by processing their grievances in a perfunctory fashion when it waited for more than a year to pursue the third and fourth steps of the grievance procedure.

In support of their claim, plaintiffs rely on evidence which they say supports their assertion that the Union's behavior was arbitrary. According to the plaintiffs, the Union acted unreasonably in believing that an agreement to hold the grievances in abeyance ever existed. Weinstein, Zakes, McEntee and Vadas each testified at the arbitration hearing that it was made clear at the initial grievance meetings that the CBA grievance provisions were in effect and that plaintiffs and the Union should act accordingly. Plaintiffs also place great emphasis on the statement in Zakes' letter of February 10, 1992 that "[t]he criminal charges have no bearing on the decision to terminate Mr. Shufford's employment." According to plaintiffs, this letter was a clear indication to the Union that the

grievances and the criminal charges were completely separate issues.

In addition, plaintiffs point to a number of occasions when *Sun* personnel allegedly told Union officials that plaintiffs' grievances were a "dead issue." Specifically, McEntee testified at the arbitration hearing that, in April of 1992, Crout called him concerning matters unrelated to plaintiffs' grievances. Near the end of this conversation, Crout inquired about the status of plaintiffs' grievances, and McEntee responded that "the matter was a dead issue, it was closed." McEntee and Weinstein also testified that, in July of 1992, they met with Crout to discuss other matters, but that Crout again raised the issue of plaintiffs' grievances. Weinstein told Crout that "those matters were dead." Finally, at a meeting attended by Crout, Dye, Culver, Zakes, Weinstein and McEntee [9], Weinstein again stated that plaintiffs' grievances were "dead." Plaintiffs place particular emphasis on the conclusion reached by Arbitrator Harkless that no abeyance agreement ever existed. In his written decision, Harkless considered the conflicting testimony presented by the parties, and resolved the dispute by crediting the *Sun*'s witnesses.

In opposing plaintiffs' claims, the Union has presented evidence supporting its assertion that it reasonably believed that the *Sun* had orally agreed to hold plaintiffs' grievances in abeyance until final resolution of the criminal matters. Crout testified that he and Zakes reached an oral agreement at an early stage of the grievance procedure. Culver and Dye have similarly stated that they were led to believe by *Sun* management that an abeyance agreement existed. Moreover, plaintiff Grant himself has testified that at the February 6, 1992 meeting he was told by Weinstein that "if I come up innocent from the charges, I could get my job back with back pay...." [10]

---

9. McEntee indicated that the meeting occurred in July of 1992. Weinstein testified that it took place in May or June.

10. This testimony was given at Grant's deposition taken on April 19, 1994 in a civil action brought by him in the Circuit Court for Baltimore City against the *Sun*, Seymour and others. *Grant v. Baltimore Sun Co., et al.*, Case No. 93204019/CLI67713. Shufford filed a similar

suit. *Shufford v. Baltimore Sun Co., et al.*, Case No. 93183057/CLI66905. Shufford and Grant ultimately reached a settlement with the *Sun*. Circuit Judge Ward later granted summary judgment in favor of Seymour, and that ruling currently is on appeal to the Court of Special Appeals of Maryland.

The Union also relies on evidence that it was the past practice of the parties that the *Sun* would not strictly enforce the time limitations contained in the CBA. The parties do not dispute that the prior relationship between the parties concerning labor matters had typically been good. Crout and Dye were longtime Union officials with considerable experience in working amicably with *Sun* management. The Union contends that under the particular circumstances here, where both plaintiffs had criminal charges pending against them, it was eminently reasonable for the parties to await a resolution of those charges rather than proceeding with the grievance procedures, particularly since plaintiffs had declined during the pendency of the criminal charges to make statements in support of their grievances because of their fear of self-incrimination. Essentially, it is the Union's position that it was reasonably justified in acting as it did, whether or not Arbitrator Harkless eventually concluded that no oral agreement to hold the grievances in abeyance had been reached.

After a careful review of the voluminous record in this case, this Court concludes as a matter of law that the Union's actions in failing to timely pursue plaintiffs' grievances were not arbitrary, discriminatory or done in bad faith. Although Arbitrator Harkless took the view that there never existed an oral agreement to hold the grievances in abeyance, substantial testimony was presented at the hearing before him that the Union reasonably believed that such an agreement existed. The fact that Harkless' opinion was some 45 pages in length indicates that there was considerable merit to the Union's position. *See Baker v. Detroit Riverview Hosp.*, 834 F.Supp. 216, 221 (E.D.Mich.1993) (mere fact that arbitrator decides against union on timeliness issue "does not come close to showing wholly irrational or arbitrary conduct"), *aff'd*, 57 F.3d 1069 (6th Cir.1995) (table). Indeed, Harkless noted that the testimony concerning the alleged agreement was "in sharp conflict" and that his decision was based on his assessment of the credibility of the witnesses. That there was a "sharp conflict" in the evidence is further apparent from a review of the depositions and affidavits submitted by the parties in support of and in opposition to the pending motion. In his written opinion, Harkless noted that the Union did not promptly pursue plaintiffs' grievances because Crout did not want to proceed promptly to arbitration with the grievants in a posture of refusing to testify. (Tr. 44). Moreover, Harkless further recognized that Crout probably felt "because of the parties' amicable relationship" that he could convince the *Sun*, if plaintiffs were exonerated of the criminal charges, to bring them back to work or persuade an arbitrator to hear the merits of their grievances. *Id.*

Plaintiffs' heavy reliance on Zakes' February 10, 1992 letter is misplaced. That letter was Zakes' response to Shufford's step two written grievance in which Shufford had complained that the January 21 meeting had been scheduled without prior notice and that he had been unable to respond to the *Sun*'s charges because of the criminal case pending against him. The *Sun* had accused Shufford not only of criminal behavior, but also of work rule violations. Under these circumstances, the letter merely suggests that the *Sun* believed that it could justify Shufford's discharge because of his work rule violations, whatever might be the future outcome of the criminal charges. There is nothing in the letter suggesting that the *Sun* would not be amenable to holding step three procedures in abeyance until the criminal charges had been resolved.

Quite obviously, the plaintiffs' ability to present evidence in support of their grievances was adversely affected by their desire that they not make statements which could be used against them in the criminal case. Indeed, the attorneys representing them in the criminal matter had advised plaintiffs that, during the pendency of the criminal case, they should not give statements in the grievance proceedings. There is nothing in Zakes' letter of February 10, 1992 denying Grant's written grievance which disclaims a link between the grievance and the criminal charges.

Finally, it is significant here that the *Sun* and the Union had a longstanding practice of not strictly abiding by the time requirements of the CBA. Although plaintiffs contend that

the "extension" in this case was far longer than that in any other case, it is not disputed that the *Sun* and the Union regularly granted each other a certain amount of latitude in the handling of grievances.[11] *See McLain v. Wilson,* 591 F.Supp. 474, 477–78 (D.Md.1984) (Young, J.); *see also Ruzicka v. General Motors Corp.,* 649 F.2d 1207, 1211–12 (6th Cir.1981) (no breach of duty of fair representation where appeal was untimely because of reliance on past practice of freely granted extensions). Indeed, the *Sun* did not until March of 1993 formally raise for the first time the timeliness defense, a date after the criminal charges had been dismissed in the state District Court. Even then, Weinstein did not contend that the grievances were untimely until he had been presented with a substantial claim from plaintiffs seeking reinstatement, back pay, benefits, and $12,000 in attorneys' fees.

The circumstances here are quite similar to those present in *Riley v. Letter Carriers Local No. 380,* 668 F.2d 224 (3d Cir.1981). In *Riley,* an employee had been discharged after he was arrested and charged with a crime, and the employee had filed a grievance. There was evidence that the union and the employer had orally agreed to hold the grievance proceedings in abeyance pending the outcome of the criminal matter. Nevertheless, the employee soon thereafter received a letter denying his grievance. A union representative assured him that the letter was a mistake and that the abeyance agreement remained in effect. *Id.* at 226–27. The criminal charges ultimately were dropped, and the union pursued the grievance in an effort to have the employee reinstated. The employer then denied that an abeyance agreement had ever existed, and the grievance was eventually denied as untimely. *Id.* at 227. The employee subsequently filed suit against the union for breach of its duty of fair representation, contending that the union had failed to recognize that the letter denying the grievance indicated that the employer had no plans to honor the abeyance agreement. The District Court granted summary judgment in favor of the union, and the employee appealed. *Id.* The Third Circuit affirmed the entry of summary judgment in favor of the union, concluding that the union's failure to timely pursue the employee's grievance was based on the past practice of the parties to orally agree to hold grievances in abeyance. The Court held that the union's behavior, although at most negligent, clearly was not arbitrary. *Id.* at 228–29.

Similar reasoning applies to the circumstances here. Even if the Union should have realized that the plaintiffs' grievances would not be held in abeyance, the Union's conduct was at most negligent. In relying upon the past practice between the parties concerning management's enforcement of time limits in the CBA, as well as on certain statements made by representatives of the *Sun,* the Union reasonably believed that the *Sun* would not challenge the grievances as untimely.

The conclusion reached by Arbitrator Harkless in the arbitration does not compel a contrary result. As Harkless noted in his 45–page opinion, his decision was in large part based upon the credibility of the witnesses who testified before him. The issue now before this Court is not whether an agreement *in fact* existed, but whether the Union acted *reasonably* in believing that there was such an agreement. Although there clearly are disputes of fact concerning the existence of an agreement, the Court is satisfied that no reasonable jury could conclude that it was irrational for the Union to believe under all the circumstances here that an agreement existed.[12]

---

**11.** Plaintiffs contend that extensions never exceeded a few months, as opposed to the more than one year delay in this case. However, as disclosed by the record, the *Sun* had never previously claimed that a grievance was untimely.

**12.** Plaintiffs also contend that the Union should have had the abeyance agreement reduced to writing. However, in the prior instance relied upon by plaintiffs involving one Leroy Coates, a *settlement agreement* was reduced to writing. There clearly is a significant difference between a settlement agreement and an open-ended abeyance agreement. As noted in *Riley,* a decision to enter into an oral rather than a written abeyance agreement is not necessarily arbitrary. *Riley v. Letter Carriers Local No.380,* 485 F.Supp. 980, 981–83 (D.N.J.1980), *aff'd,* 668 F.2d 224 (3d Cir.1981).

Plaintiffs' reliance upon *Balowski v. International Union, United Automobile Workers of America,* 372 F.2d 829 (6th Cir.1967), is misplaced. In *Balowski,* an arbitrator determined that the plaintiff was not fit to return to work, and the plaintiff challenged this decision in federal court. The District Court denied defendants' motions for summary judgment and the Sixth Circuit reversed, concluding that the arbitrator's decision was binding under the CBA there at issue. *Id.* at 832. Plaintiffs here argue that, under *Balowski,* the Union is barred from challenging Harkless' decision that no abeyance agreement existed. However, as noted, the issue here is quite different. The question in this case is whether the Union acted reasonably and not whether Harkless made a correct decision. *See Baker,* 834 F.Supp. at 221.

In sum, this Court concludes that plaintiffs cannot on this record meet their burden of proving that the Union breached its duty of fair representation by acting in an arbitrary and irrational manner. The evidence relied upon by plaintiffs is insufficient to allow a reasonable jury to conclude that it was arbitrary and irrational for the Union to believe that the *Sun* had agreed to waive the time requirements of the CBA. Plaintiff Grant himself believed that the *Sun* had agreed to reinstate him if he was cleared of the criminal charges. Viewed in a light most favorable to the plaintiffs, the evidence at most establishes that the Union was negligent in relying on past practice and certain representations made by *Sun* management. Accordingly, this Court concludes as a matter of law that the Union's failure to timely seek arbitration was not "so far outside a 'wide range of reasonableness' as to be irrational." *See O'Neill,* 499 U.S. at 67, 111 S.Ct. at 1130.[13]

(c)

*Decision to Bifurcate the Arbitration*

■ Plaintiffs also argue that the Union breached its duty of fair representation by agreeing to bifurcate the arbitration process. By this contention, plaintiffs are in essence questioning a strategic judgment made by counsel for the Union. This Court, however, will not undertake to second guess the valid tactical decisions made by the Union in handling plaintiffs' grievances. *See Ash v. United Parcel Serv., Inc.,* 800 F.2d 409, 411 (4th Cir.1986) ("Simple negligence, ineffectiveness, or poor judgment is insufficient to establish a breach of the union's duty.").

After Weinstein formally raised the timeliness issue in late March of 1993, the *Sun* was reluctant to even proceed with arbitration. The *Sun* eventually agreed to go forward with arbitration, provided that there be a bifurcation of the timeliness issue and the merits. The Union's consent to bifurcate was no more than a tactical decision which was successful in having the matter proceed to arbitration. In any event, plaintiffs were not prejudiced by the decision to bifurcate. Arbitrator Harkless dismissed the grievances as untimely, and what he might have concluded on the merits has no relevance to the issues before this Court.

Accordingly, the Court concludes as a matter of law that the Union did not breach its duty of fair representation when it agreed to bifurcate the arbitration proceedings.

(d)

*Failure to Include Plaintiffs' Private Attorneys*

■ Plaintiffs next contend that the Union breached its duty of fair representation when it refused to accept the assistance of plaintiffs' counsel in preparing for the arbitration hearing. According to plaintiffs, their attorneys were familiar with the criminal cases and would have provided important insight into the grievance issues.

This claim has no merit. An important part of a union's broad discretion in handling an employee's grievance is the right to limit the role of a grievant's private attorney. *See, e.g., Garcia v. Zenith Elec. Corp.,* 58 F.3d 1171, 1179 (7th Cir.1995) (citing additional cases). A union has the right to be the sole representative of its members, and it can

___

**13.** Plaintiffs also contend that defendants acted in bad faith by misleading them about the existence of an abeyance agreement. There is no evidence, however, that defendants were in any way dishonest or deceitful in dealing with the plaintiffs. *See International Union of Electronic Workers v. NLRB,* 41 F.3d 1532, 1537 (D.C.Cir. 1994).

refuse to include private counsel in its handling of a grievance if it so chooses. *Castelli v. Douglas Aircraft Co.,* 752 F.2d 1480, 1483–84 (9th Cir.1985).

It is hardly irrational for a union to exclude a private attorney from the grievance process. In *Garcia,* for example, the Court found that the union representative could properly have determined that the presence of an outside attorney "might encourage arguments that were meritless and misrepresented the case." *Garcia,* 58 F.3d at 1180. In this case, the arbitration hearing addressed only the timeliness issue, and the actual merits of the criminal case had only marginal relevance to the question whether the grievances had been processed in a timely manner.

On the record here, the Court is satisfied that the refusal of the Union to accept assistance from plaintiffs' private attorneys was not arbitrary and did not, as a matter of law, constitute a breach of the duty of fair representation.

#### (e)
*Ineffectiveness at the Arbitration Hearing*

■ As their final claim, plaintiffs argue that the Union represented them ineffectively at the arbitration hearing. According to plaintiffs, David Sherbow, Esq., counsel for the Union, mishandled the arbitration hearing. Plaintiffs assert that the Union officials who testified were not properly prepared for their testimony, that plaintiff Shufford was not called to testify as a witness, and that plaintiff Grant's testimony was "short and essentially meaningless."

Viewing plaintiffs' evidence in the light most favorable to them, this Court concludes that the Union's representation of plaintiffs at the arbitration hearing was not so ineffective as to be arbitrary. Once again, plaintiffs' arguments amount essentially to little more than a *post hoc* disagreement with the strategy and methods employed by the Union in representing their interests. However, it is well established that a Union has a broad discretion in its handling of a grievance, and the evidence required to establish

ineffective representation "goes considerably beyond the requirements of a malpractice suit." *Garcia,* 58 F.3d at 1176.[14] As the Fourth Circuit has noted, simple negligence, ineffectiveness or poor judgment on the part of a union is insufficient to establish a breach of its duty of fair representation. *Ash,* 800 F.2d at 411.

In *Garcia,* the Seventh Circuit determined that a strategic choice not to present the testimony of a grievant did not constitute arbitrary behavior by the union. *Id.* at 1178. In that case, the Seventh Circuit held that a plaintiff in a case of this sort must satisfy a high standard in order to establish that the union's representation was merely "perfunctory." Where the union pursued a "rational strategy with sufficient competence and vigor," the Court found that there was no breach of the duty of fair representation. *Id.* at 1178–79. Similarly, the Ninth Circuit has concluded that a union did not breach its duty of fair representation, even where the union representative spent only one-and-a-half hours in preparation for the arbitration proceeding and failed to call key witnesses. *Castelli,* 752 F.2d 1480, 1483 (9th Cir.1985).

A review of the extensive record in this case indicates that the Union satisfied its obligation to fairly represent plaintiffs at the arbitration hearing. Attorney Sherbow filed a 22–page brief in support of the Union's position. There was extensive testimony presented on the Union's behalf, and the transcript of the hearing is some 250 pages in length. Sherbow cross-examined each of the witnesses for the *Sun,* and elicited direct and material testimony from defendants Crout, Culver and Dye and from plaintiff Grant. The decision that plaintiff Shufford should not testify was a strategic judgment based on a discussion in which Sherbow, Crout, Dye, Culver, Grant and Shufford all participated. Finally, the fact that Arbitrator Harkless found it necessary to write a very lengthy opinion indicates that his decision was based on a well-developed record.

On the record here, this Court concludes that plaintiffs were fairly and competently

---

14. From its review of the lengthy transcript of the arbitration hearing, this Court concludes that

not even malpractice on the part of the Union's attorneys has been proved.

represented at the arbitration hearing. Although plaintiffs may now wish that the Union had conducted the arbitration hearing differently, the Court is satisfied as a matter of law that the Union's conduct was not arbitrary.

## VI

### *Conclusion*

For all the reasons stated, this Court has concluded that all defendants are entitled to the entry of summary judgment. Defendants Culver, Crout and Dye cannot be held personally liable for the actions of the Union in this case.

Furthermore, plaintiffs cannot on this record establish that the Union's actions were arbitrary, discriminatory or undertaken in bad faith. Because the Union reasonably believed that the *Sun* had agreed to waive the time requirements of the CBA, its behavior in the handling of plaintiffs' grievances falls within an acceptable "wide range of reasonableness." Moreover, the Union did not act irrationally in its conduct of the arbitration proceeding. Accordingly, the Court is satisfied as a matter of law that the Union did not breach its duty of fair representation and is entitled to summary judgment in this case. An appropriate Order will be entered by the Court.